DANIEL L. GONZALEZ, Bar No. 223517
dlgonzalez@littler.com
ALEXANDRA BERNSTEIN, Bar No. 327492
abernstein@littler.com
LITTLER MENDELSON P.C.
2049 Century Park East
5th Floor
Los Angeles, California 90067.3107
Telephone: 310.553.0308
Fax No.: 310.553.5583

Attorneys for Plaintiff
IRVINE UNIFIED SCHOOL DISTRICT

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRVINE UNIFIED SCHOOL DISTRICT,<br><br>                Plaintiff,<br><br>        v.<br><br>SHARON LANDERS AND JOSEPH GAGLIANO, PARENTS ON BEHALF OF A.G., A MINOR,<br><br>                Defendants. | Case No.<br><br>**COMPLAINT IN SUPPORT OF APPEAL OF A CALIFORNIA OFFICE OF ADMINISTRATIVE HEARING DECISION UNDER 20 U.S.C. § 1415(i)(2)** |

NOW COMES Plaintiff Irvine Unified School District ("Plaintiff" or "District" by its attorneys, Littler Mendelson P.C. and for a complaint against Defendants A.G. ("Student"), and Sharon Landers and Joe Gagliano ("Parents") (collectively Student and Parents referred to as "Defendants"), hereby alleges as follows:

1.      This civil action is brought pursuant to the provisions of 20 U.S.C. §1400 *et seq.*, more commonly known as the "Individuals with Disabilities Education Act" ("IDEA"). This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that it arises under the IDEA. Moreover, Section 1415(i)(2) of Title 20 of the United States Code; Title 34, section 300.516 of the Code of Federal Regulations; and California Education Code section 56505(k) vest jurisdiction in this Court.

2.      Venue in this Court is proper under 20 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

3.      This Complaint is timely filed within 90 days of the receipt by the District of the final written decision ("Decision") issued on December 30, 2020 by the California Office of Administrative Hearings ("OAH") in OAH Consolidated Case Nos. 2021080012 and 2021080052, as required by section 56505(k) of the California Education Code.

## THE PARTIES

4.      Plaintiff is a public school district duly organized and existing under the laws of the State of California and is located within Orange County.

5.      Defendant Parents are named as defendants herein pursuant to Rule 19(a) of the Federal Rules of Civil Procedure because they claim an interest relating to the subject of this action and are so situation that the disposition of the action in their absence may as a practical matter impair or impede their ability to protect that interest. Parents filed a due process hearing request on behalf of Student and has

claimed to possess educational rights pertaining to Student.

6.     Defendant Student is a minor where at least one of the Parents claims to reside within the boundaries of the District. Defendant Student is alleged to currently reside within the boundaries of the District. Defendant Student is alleged to currently reside with one of the Parents within the District's boundaries.

7.     Defendant Student is a child who has been receiving special education and related services under the IDEA and state law.

## PROCEDURAL HISTORY

8.     On July 30, 2021, Student, through her Parents, filed a due process hearing request ("complaint") naming the District as Respondent.  The complaint raised several IDEA-related issues.

9.     In accordance with the IDEA and state law, the OAH held a due process hearing on September 21, 28, and 29, 2021, and October 6, 7, 12, 19, 20, 26, and 27, and December 10, 2021, in connection with a dispute involving Student's education in the District.

10.     Administrative Law Judge ("ALJ") Tara Doss issued a decision in this case on December 30, 2021. Defendants  prevailed on 1 sub-issue, while the District prevailed on 28 sub-issues heard in the due process hearing. A copy of the decision being appealed is attached hereto as Exhibit "A."

11.     The District has fulfilled its obligation to exhaust its administrative remedies under 20 U.S.C. § 1415(i) by reason of having participated in due process proceedings as evidenced by the issuance of the Decision by the OAH.

## GENERAL ALLEGATIONS

12.     The District contends that the ALJ Doss mistakenly held that the District denied Student a Free Appropriate Public Education ("FAPE") during the 2019-2020 school year, including extended school year, by failing to file a request for due process. (Due Process Hearing Issue 2(i).)

/ / /

1

## **PRAYER FOR RELIEF**

2        WHEREFORE, the District prays that this Court receive the records of the

3   administrative proceedings and, after consideration of the arguments of counsel,

4   enter judgment in favor of the District, reversing the portions of the decision of ALJ

5   Doss that are adverse to the District.

6   Dated:          February 7, 2022                Respectfully submitted,

7                                                   LITTLER MENDELSON P.C.

8

9

10                                                  Daniel L. Gonzalez
                                                    Alexandra Bernstein
11                                                  Attorneys for Plaintiff
                                                    IRVINE UNIFIED SCHOOL
12                                                  DISTRICT

13  4875-2830-2348.2 / 095573-1008

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

_____

CASE NO. 2021080012
CASE NO. 2021080052

_____

THE CONSOLIDATED MATTERS INVOLVING

PARENTS ON BEHALF OF STUDENT,

and

IRVINE UNIFIED SCHOOL DISTRICT.

_____

DECISION

DECEMBER 30, 2021

On July 30, 2021, Student filed a due process hearing request, called a complaint, with the Office of Administrative Hearings, State of California, naming Irvine Unified School District.  On August 2, 2021, Irvine Unified School District filed a complaint naming Student.  The Office of Administrative Hearings is called OAH.  Irvine Unified School District is called Irvine.  On August 12, 2021, OAH consolidated the two cases. OAH granted continuances in the cases on September 21, and 29, 2021, and October 7, 12, 20, and 27, 2021.

Administrative Law Judge Tara Doss presided over the hearing via videoconference using the Microsoft Teams application, on September 21, 28, and 29, 2021, and October 6, 7, 12, 19, 20, 26, and 27, and December 10, 2021. An Administrative Law Judge is called ALJ.  Attorneys Christian Knox and Jennifer Chang represented Student.  Parents attended on all days of hearing.  Student did not attend the hearing.  Attorneys Daniel Gonzalez and Alexandra Bernstein represented Irvine. Jennifer O'Malley, Director of Special Education, Alternative Dispute Resolution, attended all days of hearing on behalf of Irvine.  Allison Robbins, Director of Special Education, Secondary and Adult Transition, attended one day of hearing on behalf of Irvine.

At the request of the parties, OAH granted a continuance to December 20, 2021, to file written closing briefs.  OAH closed the record and submitted the case for decision on December 20, 2021.

ISSUES

In this Decision, a free appropriate public education is called a FAPE and an individualized education program is called an IEP.  On September 15, 2021, Student withdrew Issues 1(d), 2(c), 3(c), and 3(i), as stated in the September 14, 2021 Order Following Prehearing Conference.  On September 20, 2021, Student limited the relevant time period of Issue 3 to end on January 4, 2021.  The issues have been reorganized to reflect these changes.

STUDENT'S ISSUES

1. Did Irvine deny Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by:
    a. failing to timely convene an annual IEP team meeting;

    b.  failing to implement Student's stay-put placement;

    c.  failing to offer appropriate, measurable goals in all areas of need;

    d.  failing to offer an appropriate structured literacy program;

    e.  offering a modified curriculum;

    f.  failing to offer appropriate placement;

    g.  predetermining Student's placement;

    h.  failing to consider a continuum of placement options;

    i.  failing to offer appropriate extended school year placement; and

    j.  failing to file a request for due process hearing?

2.  Did Irvine deny Student a FAPE during the 2019-2020 school year, including extended school year, by:

    a.  failing to implement Student's stay-put placement;

    b.  failing to offer appropriate, measurable goals in all areas of need;

    c.  failing to offer an appropriate structured literacy program;

    d.  offering a modified curriculum;

    e.  failing to offer appropriate placement;

    f.  predetermining Student's placement;

    g.  failing to consider a continuum of placement options;

    h.  failing to offer appropriate extended school year placement; and

    i.  failing to file a request for due process hearing?

3.  Did Irvine deny Student a FAPE from the start of the 2020-2021 school year, through January 4, 2021, by:

    a.  failing to implement Student's stay-put placement;

    b.  failing to offer appropriate, measurable goals in all areas of need;

    c.  failing to offer an appropriate structured literacy program;

    d.  offering a modified curriculum;

   e.  failing to offer appropriate placement;

   f.  predetermining Student's placement;

   g.  failing to offer appropriate extended school year placement; and

   h.  failing to timely complete a triennial IEP?

4. Was Irvine's November 12, 2020 psychoeducational evaluation inappropriately conducted?

## IRVINE'S ISSUE

5. Was Irvine's November 12, 2020 multidisciplinary assessment of Student legally compliant, such that Student is not entitled to an independent educational evaluation at public expense?

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, called IDEA, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000, et seq.; Cal. Code Regs., tit. 5, § 3000, et seq.)  The main purposes of the IDEA, are to ensure:

- all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs, and prepare them for further education, employment, and independent living; and

- the rights of children with disabilities, and their parents are protected.  (20 U.S.C. § 1400(d)(1); see Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter related to the identification, assessment, or educational placement of the child, or the provision of a

FAPE to the child.  (20 U.S.C. § 1415(b)(6) and (f); 34 C.F.R. § 300.511 (2006); Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents, and has the burden of proof by a preponderance of the evidence.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *Schaffer v. Weast* (2005) 546 U.S. 49, 56-62; and see 20 U.S.C. § 1415(i)(2)(C)(iii).)  Here, Student has the burden of proof on the issues raised in Student's case, and Irvine has the burden of proof on the issue raised in Irvine's case.  The factual statements below constitute the written findings of fact required by the IDEA and California law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)  All references to the Code of Federal Regulations are to the 2006 version, unless otherwise noted.

Student was 15 years old at the time of hearing.  Student resided within Irvine's attendance boundaries at all relevant times.  Student was eligible for special education under the category of other health impairment, as a result of inattention and heightened alertness impacting the ability to pay attention in class and executive functioning skills.

## PRELIMINARY ISSUE: STATUTE OF LIMITATIONS AND TOLLING AGREEMENT

### NO BINDING LEGAL AUTHORITY SUPPORTS TOLLING AGREEMENTS AS AN EXCEPTION TO THE STATUTE OF LIMITATIONS IN SPECIAL EDUCATION CASES

The parties contend OAH should recognize a May 26, 2021 agreement between the parties that tolled the two-year statutory period back to January 6, 2019.  This agreement is called a tolling agreement.  Specifically, the parties agreed to dismiss OAH

cases they had pending against each other at that time, with the option to file new OAH cases with the same claims, no later than August 2, 2021.  The parties agreed the statutory period of any new OAH case would be from January 6, 2019, through the date the new cases were filed, and not the two-year statutory period in California Education Code section 56505.

Student argues OAH should recognize the parties' tolling agreement for several reasons.  First, Student argues Irvine waived a statute of limitations defense because it was not raised as an affirmative defense.  Second, Student argues Irvine was put on notice of the issues that fall outside of the two-year statute of limitations in Student's January 2021 due process hearing request.  Third, Student argues OAH should recognize the tolling agreement for equitable reasons because OAH has recognized tolling agreements in other cases and because tolling agreements are an alternative to OAH's assertion that continuances are disfavored.  Finally, Student argues tolling agreements encourage dispute resolution and reduce litigation costs.

Irvine did not offer any specific arguments in favor of OAH recognizing the tolling agreement but indicated it does not oppose the agreement's enforcement.

A party may file a due process complaint with respect to any matter relating to the identification, evaluation, or educational placement of a child, or the provision of a FAPE to that child.  (20 U.S.C. § 1415(b)(6); Ed. Code, § 56501, subd. (a).)  OAH's jurisdiction is limited to these matters.  (*Wyner v. Manhattan Beach Unified Sch. Dist.* (9th Cir. 2000) 223 F.3d 1026, 1028-1029.)  Neither the IDEA, nor the California Education Code grants OAH the authority to enforce private tolling agreements between parties.

With two limited exceptions, a party must file a due process complaint within two years from the date they knew or had reason to know of the facts underlying the basis for the request.  (20 U.S.C. § 1415(f)(3)(C); Ed. Code, § 56505, subd. (l).)  This time period is commonly referred to as the statute of limitations.  The two-year statute of limitations does not apply to a parent who was prevented from requesting the due process hearing because either the educational agency misrepresented that it had solved the problem forming the basis of the due process request or if the educational agency withheld information from the parent that it was legally required to provide.  (20 U.S.C. § 1415(f)(3)(D); Ed. Code, § 56505, subd. (l).)  These are the only two exceptions in the IDEA and California Education Code that allow for tolling the statute of limitations. There is no exception that allows the parties to agree to extend this time period.

Student's arguments in favor of OAH recognizing the parties' tolling agreement are not persuasive.  Student's argument regarding Irvine's failure to raise statute of limitation as an affirmative defense is not persuasive because the rules of civil procedure that govern this requirement do not apply in special education cases.  The IDEA and California law mandates that OAH issue a decision within 75 days of a student-filed due process hearing request.  (34 C.F.R. § 300.515(a); Ed. Code, § 56505, subd. (f)(3).)  While OAH may grant an extension of that timeline, any such continuance must be based on a showing of good cause.  (34 C.F.R. § 300.515(a) and (c); Ed. Code, § 56505, subd. (f)(3).) The intent of this directive is to ensure speedy resolution in special education disputes. Further, the IDEA specifically allows parties to file separate due process hearing requests for separate issues.  (34 C.F.R. § 300.513(c); Ed. Code, § 56509.)

For this reason, there is no requirement in special education law, as there is in civil cases, that parties must bring all claims at the same time in one filing.

To further encourage speedy resolution of cases, both federal and California law limit the statute of limitations in special education cases to two years, unless a school district prevents a parent from requesting a due process hearing in two very specific exceptions.  (See *M.M. v. Lafayette School Dist., et al* (9th Cir. 2014) 767 F.3d 842, 859.) Here, Parents were not prevented from requesting a due process hearing. Instead, Parents chose to delay their filing through a tolling agreement.  To allow the parties to circumvent the statute of limitations provisions through private agreement is contrary to special education law and is not supported by any legal authority.

Student's contention that it would be improper for OAH to deny enforcement of the parties' tolling agreement for equitable reasons is contrary to existing legal authority.  While there are no Ninth Circuit or California cases that address the validity of tolling agreements, at least one federal Circuit court has held that common law or equitable exceptions to the statute of limitations do not apply to IDEA cases.  (*D.K. v. Abington School Dist.* (3rd Cir. 2012) 696 F.3d 233, 248.)  The Third Circuit reasoned if Congress intended there to be additional exceptions to the two-year statute of limitations, including parties' ability to toll the statute through private agreement, they could have included such exceptions when they reauthorized the IDEA in 2004.  Instead, the legislative and regulatory history of the 2004 amendments to the IDEA make clear that only the enumerated statutory exceptions exempted a student from having claims time-barred by the statute of limitations.  (*D.K., supra,* at p. 248.)  Further, where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent.  (*Id.,* citing *Andrus v. Glover Constr. Co.,* (1980) 446 U.S. 608, 616-617.)

Similarly, if the California legislature intended to create additional exceptions to the two-year statute of limitations, they could have done so when they amended the

California Education Code in 2005, to align with the IDEA's 2004 amendments. The legislature took affirmative steps to amend the statute of limitations in special education cases to reduce the formerly three-year statute of limitations of California Education Code section 56505, subdivision (l), to reflect the two-year statutory period in the 2004 IDEA amendments. The legislature could have included additional exceptions like tolling the statute of limitations through private agreement, but because it did not, the plain language of the statute governs, and the legislature is presumed to have meant exactly what it said. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1081.). Whether Irvine had notice of the issues that fall outside of the two-year statutory period, as Student argues, is irrelevant.

Because the parties offered no binding legal authority that supports OAH recognizing tolling agreements in special education cases and Student did not prove that either of the statutory exceptions to the statute of limitations apply, this Decision will not recognize the parties' May 26, 2021 tolling agreement. Accordingly, Student's issues that arose more than two years before the due process hearing request was filed, or before July 30, 2019, are time-barred. Any reference in this Decision to facts and allegations that happened before July 30, 2019, is for background purposes only.

## ISSUE 1: DID IRVINE DENY STUDENT A FAPE FROM JANUARY 8, 2019, THROUGH THE END OF THE 2018-2019 SCHOOL YEAR, INCLUDING EXTENDED SCHOOL YEAR

The allegations in Issue 1 are outside of the statute of limitations. Therefore, Irvine prevailed on this issue.

## ISSUES 2(A) AND 3(A): STAY PUT PLACEMENT

Student contends Irvine had a duty to fund Student's placement at The Prentice School, a nonpublic school, during the 2019-2020, and 2020-2021 school years, through January 4, 2021.  Specifically, Student contends Prentice was Student's stay put placement because a February 19, 2019 OAH decision determined Irvine denied Student a FAPE, ordered reimbursement for Prentice during the 2018-2019 school year, and as a result, Prentice is Student's current educational placement under the IDEA.  Further, Student alleges Irvine's failure to comply with prior OAH stay put orders denied Student a FAPE.

Irvine contends OAH's February 19, 2019 decision awarded reimbursement for Prentice solely as compensatory education and did not name Prentice as Student's stay put placement.  Further, Irvine contends that OAH does not have the authority to enforce a previous OAH order, and even if it did, there was not a stay put order issued in this case to enforce.

A FAPE means special education and related services provided to a child with a disability at public expense, that meet state educational standards and conform with the child's IEP.  (20 U.S.C. §§ 1401(9) and 1412(a)(1); 34 C.F.R. §§ 300.17 and 300.101(a).)  Parents and school personnel develop an IEP for an eligible student based upon state law and the IDEA.  (20 U.S.C. §§ 1401(14) and 1414(d)(1); 34 C.F.R. §§ 300.320, 300.321, and 300.501; see Ed. Code, §§ 56031, 56032, 56341, 56345, subd. (a), and 56363, subd. (a).)

Special education is instruction specially designed to meet the unique needs of a child with a disability.  (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.)  Related services are transportation and other developmental, corrective, and supportive

services that are required to assist the child in benefiting from special education.
(20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a).)  An IEP is a written
statement for each child with a disability that is developed, reviewed, and revised based
upon state law and the IDEA.  (20 U.S.C. §§ 1401(14), 1414(d)(1); 34 C.F.R. § 300.320;
Ed. Code, § 56032.)

In general, a child eligible for special education must be provided access to
specialized instruction and related services which are individually designed to provide
educational benefit through an IEP reasonably calculated to enable a child to make
progress appropriate in light of the child's circumstances.  (*Board of Educ. of the
Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201-204; *Endrew F.
v. Douglas County School Dist. RE-1* (2017) 580 U.S. ___ [137 S.Ct. 988, 1000].)

During a due process hearing, a student is entitled to remain in the current
educational placement, unless the school district and parents agree otherwise.
(20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a); Ed. Code, § 56505, subd. (d).)  This provision is
referred to as stay put.  IDEA does not define current educational placement, but courts
have interpreted it to mean the placement set forth in the student's last implemented
IEP.  (*K.D. ex rel. C.L. v. Hawaii Dept. of Educ.* (9th Cir. 2011) 665 F.3d 1110, 1117-1118;
see also *L.M. v. Capistrano Unified School Dist.* (9th Cir. 2009) 556 F.3d 900, 902-903;
and see *Thomas v. Cincinnati Board of Educ.* (6th Cir. 1990) F.2d 618, 625.)

Where a parent unilaterally changes the placement of a child, but a subsequent
administrative or judicial decision confirms the parental placement is appropriate, the
placement must be treated as an agreement between the State and the parents to a
change in placement, and the placement becomes the current educational placement
for purposes of stay put.  (See 34 C.F.R. § 300.518(d); see also *K.D. ex rel., supra*, 665 F.3d
at p. 1118 (citing *Clovis Unified School Dist. v. California Office of Admin. Hearings* (9th

Cir. 1990) 903 F.2d 635, 641).)  However, such a favorable decision for a parent must expressly find that the private placement was appropriate.  (*K.D. ex rel., supra*, at p. 1118 (citing *L.M., supra*, 556 F.3d at p. 903-904).)

## IRVINE DID NOT HAVE A DUTY TO FUND STUDENT'S PLACEMENT AT PRENTICE UNDER STAY PUT

Student did not prove Irvine had a duty, under stay put provisions, to fund placement at Prentice during the 2019-2020, or 2020-2021 school years.

Parents unilaterally placed Student at Prentice in August 2018 because they did not believe Student was making academic progress with the special education placement and services Irvine provided.  Also, in August 2018, both Irvine and Student filed separate due process hearing requests, naming each other.  Irvine sought to prove its offer of FAPE in a June 6, 2018 IEP was appropriate, and Student sought to prove Irvine denied Student a FAPE in the June 6, 2018 IEP, among other issues.  OAH consolidated the cases and held a due process hearing in November and December 2018.

On February 19, 2019, OAH issued a decision and determined, in part, that Irvine denied Student a FAPE from October 2016, through June 2018, by placing Student on a modified curriculum without informing Parents of the educational impact of doing so, thereby denying Parents meaningful participation in the IEP process.  As compensatory education, ALJ Cole Dalton awarded Parents reimbursement for costs and tuition related to Student's attendance at Prentice during the 2018-2019 school year.  ALJ Dalton determined Prentice was an appropriate placement for purposes of a reimbursement award but did not analyze whether Prentice offered Student a FAPE and did not name Prentice as Student's stay put placement.

Student filed subsequent due process hearing requests with OAH, naming Irvine, on August 28, 2019, and December 11, 2019.  In each case, OAH granted Student's Motion for Stay Put and named Prentice as Student's stay put placement while those case were pending.  Student dismissed these cases on November 5, 2019, and February 3, 2020, respectively.  Student's stay put protection ended upon dismissal of each case.

On December 5, 2019, the United States District Court for the Central District of California vacated OAH's February 2019 decision, in part, and remanded it back to OAH to determine whether the education Student received at Prentice was modified, and if so, whether that changed OAH's determination regarding whether Student could receive meaningful educational benefit from a modified curriculum.  On February 18, 2020, during the remand case, ALJ Dalton denied Student's Motion for Stay Put and rejected Student's argument that OAH's determination that Prentice was appropriate for purposes of reimbursement, was a decision in favor of Student's private placement, and therefore, became Student's stay put placement.  On April 2, 2020, OAH issued the remand decision and ALJ Dalton reiterated that Prentice was deemed proper only for purposes of a reimbursement award.

Parents who unilaterally move their child to a private placement, without the consent of the school district, do so at their own financial risk.  (*Florence County School Dist. Four v. Carter* (1993) 510 U.S. 7, 15 (quoting *School Comm. of Burlington v. Dept. of Educ. of Mass.* (1985) 471 U.S. 359, 373-374); see *W.G. v. Bd. of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1487.)  Parents are entitled to reimbursement only if a court concludes both that the public placement violated IDEA and that the private school placement was proper under the IDEA.  (*Florence County, supra,* at p. 15.)

Here, Parents chose to continue Student's placement at Prentice after the 2018-2019 school year concluded.  Parents did so at their own financial risk and consistent with *Florence County*, are only entitled to reimbursement for the cost of that placement if a court concludes Irvine's proposed placement did not offer a FAPE.  Thus, reimbursement for Prentice was not automatic for the 2019-2020, and 2020-2021 school years, and required a determination from OAH or another court that Irvine failed to offer Student a FAPE for those years.

Further, Student's argument that Irvine denied Student a FAPE by failing to comply with stay put orders from previous OAH cases is not persuasive.  An OAH stay put order is in effect only during the particular case in which it is sought.  Once the case is dismissed or OAH issues a decision, OAH's stay put order no longer applies.  Stay put orders from previous OAH cases have no bearing on what Student's current educational placement is in this case.  Student did not file a Motion for Stay Put in this case, so Student's current educational placement was never determined.  Accordingly, Student's argument fails.  Irvine prevailed on Issues 2(a) and 3(a)

## ISSUES 2(B) AND 3(B): GOALS

Student contends Irvine failed to offer appropriate goals in all areas of need in the June 3, 2019, March 13, and May 8, 2020 IEPs.  Specifically, Student contends Irvine should have offered goals in reading decoding, reading fluency, reading comprehension, math, and executive functioning.  Irvine contends the goals offered in the June 3, 2019, March 13, and May 8, 2020 IEPs were appropriate.

An IEP describes a student's needs, including academic and functional goals related to those needs.  It also provides a statement of the special education, related

services, and program modifications and accommodations that will be provided for the student to:

- advance in attaining the goals,
- make progress in the general education curriculum, and
- participate in education with disabled and nondisabled peers.  (20 U.S.C. §§ 1401(14), 1414(d)(1)(A); Ed. Code, §§ 56032, 56345, subd. (a).)

The student's needs must be described through a statement of present levels of academic achievement and functional performance, including how the student's disability affects the involvement and progress in the general education curriculum.  (20 U.S.C. § 1414(d)(1)(A)(i)(I); 34 C.F.R. § 300.320(a)(1).)  The goals must be measurable and designed to meet the student's needs so that the student can be involved in and make progress in the general education curriculum and meet each of the other educational needs.  (20 U.S.C. § 1414(d)(1)(A)(i)(II); 34 C.F.R. § 300.320(a)(2)(i).)  The IEP must also describe how progress towards the goals developed will be measured and reported.  (20 U.S.C. § 1414(d)(1)(A)(i)(III); 34 C.F.R. § 300.320(a)(3).)

Goals are typically developed once a year at a student's annual IEP team meeting. Annual goals should describe what a student with a disability can reasonably be expected to accomplish within a 12-month period of the special education program. (Letter to Butler, 213 IDELR 118 (OSERS 1988); Notice of Interpretation, Appendix A to 34 C.F.R., part 300, Question 4 (1999 regulations).)  The IEP must show a direct relationship between the present levels of performance, the goals, and the specific educational services to be provided.  (Cal. Code Regs., tit. 5, § 3040, subd. (b).)

GOALS WRITTEN IN THE JUNE 3, 2019 IEP ARE OUTSIDE THE STATUTE OF LIMITATIONS

Student did not prove Irvine failed to offer appropriate goals in the June 3, 2019 IEP, in effect during the 2019-2020 school year.  Whether an IEP offers a student a FAPE is assessed in light of information available at the time the IEP was developed, not in hindsight.  (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.)  An IEP is a snapshot, not a retrospective; it must be evaluated in terms of what was objectively reasonable when the IEP was developed.  (*Id.* (quoting *Fuhrmann v. East Hanover Bd. of Educ.* (3rd Cir. 1993) 993 F.2d 1031, 1036.)

A parent may not bring a due process claim challenging the appropriateness of an IEP that was created outside the statute of limitations in the absence of an implementation issue, although the IEP document is in effect within the statute of limitations, as special education law does not recognize the doctrine of continuing violations as an exception to the two-year statute of limitations.  (See *J.L. v. Ambridge Area School Dist.* (W.D.Pa. 2008) 622 F.Supp.2d 257, 268-269; see also *E.F. v. Newport Mesa Unified School Dist.* (C.D. Cal., June 23, 2015, No. SACV 14–00455–CJC(RNBx)) 2015 WL 3867982, *8, fn. 6).)

Irvine held an annual IEP team meeting for Student on June 3, 2019, and offered academic and functional goals for the 2019-2020 school year.  Pursuant to *Adams*, the question is whether the goals, as written on that date, were appropriate.  Because the June 3, 2019 IEP is outside of the two-year statute of limitations, this Decision will not address this issue.  Accordingly, Irvine prevailed on Issue 2(b).

IRVINE OFFERED APPROPRIATE GOALS DURING THE 2020-2021 SCHOOL
YEAR

Student did not prove Irvine failed to offer appropriate goals in the March 13,
and May 8, 2020 IEPs, in effect during the 2020-2021 school year, through January 4,
2021.  Irvine held Student's annual IEP team meeting on March 13, 2020, and completed
it on May 8, 2020.  Student still attended Prentice at the time of the meetings.  In
preparation for the IEP team meeting, Irvine educational specialist Jennifer Hill
requested input from Student's teachers at Prentice.  Hill sent each teacher a
questionnaire to complete regarding Student's strengths and challenges across
domains, including communication, motor skills, social emotional, attention and
executive functioning, and academics.  Hill also requested information regarding the
accommodations each teacher used and whether they were effective for Student.
Student's English language arts, math, and social studies teachers completed and
returned the form to Hill.

Also, in preparation for the IEP, Irvine school psychologist Stefanie Cachola
observed Student at Prentice.  Cachola requested to interview Student but Parents did
not consent.  Hill also observed Student at Prentice and briefly met with Student in an
attempt to obtain baselines for goals related to telling time and identifying the calendar.

The IEP team reviewed Student's present levels of performance at the March
2020 IEP team meeting.  Student's English language arts teacher identified areas of
concern in decoding grade level text, reading fluency, reading comprehension, spelling,
and composing paragraphs.  Student's math teacher identified areas of concern in
computation skills, solving word problems, multiplication, division, fractions, time
concepts, and multi-step equations.  None of Student's teachers indicated any

significant concern with executive functioning skills, such as Student not being prepared for class or completing assignment, being disorganized, or failing to follow classroom rules.  In fact, the vocational present levels in the IEP stated Student could maintain a planner, was typically prepared for school, followed school rules, and did not have issues with organizational skills.

Student's social emotional and speech and language present levels identified Student's need to socialize with other students, participate more in group work, self-advocate when in need of help with classwork, and identify and verbalize feelings when frustrated.

Irvine developed 16 annual goals: six math goals, three reading goals, two writing goals, three speech and language goals, and two social emotional goals.  All goals were developed with input from Prentice staff and Parents, and thoroughly discussed at both IEP team meetings.  The math goals focused on time, referencing the calendar, multiplication, division, and fractions.  The reading goals focused on spelling, understanding word meanings, and listening comprehension.  While there were no goals specifically labeled as reading decoding, reading fluency, or reading comprehension, the goals drafted encompassed these skills.

The spelling goal required Student to spell words after the teacher read them aloud.  This goal addressed reading decoding, which is the ability to sound out parts of words and then join those parts to form the word.  The word meaning goal required Student to read a short passage containing specific vocabulary words, look up the vocabulary words in a glossary, and define the word.  This goal addressed reading decoding, fluency, and comprehension.  Fluency is the ability to read with speed, accuracy, and proper expression.  Comprehension is the ability to understand what is

read.  The listening comprehension goal required Student to listen to a story and answer who, what, where, and when questions.  This goal also addressed comprehension.

The writing goals addressed Student's need to compose and edit paragraphs using correct writing mechanics.  The speech and language goals addressed Student's need to improve collaborative group discussion and learn social communication strategies.  The social emotional goals addressed Student's need to identify and express feelings, and to learn coping strategies.

Irvine did not develop an executive functioning goal, but as discussed above, Student's teachers did not identify executive functioning as a significant area of concern for Student.  Further, Irvine addressed any executive functioning needs Student had within the accommodations offered in the March, and May 2020 IEPs.  For example, the accommodations included visual supports for multistep tasks, frequent checks for understanding of directions, use of graphic organizers to support academics, and behavior momentum strategies to help Student complete tasks.  Therefore, Student did not require an executive functioning goal to access the educational curriculum.

There was a direct relationship between the present levels of performance identified in the IEP and the annual goals developed.  Irvine worked collaboratively with all members of the IEP team to develop and revise the goals.  Each goal indicated a one-year target to achieve the goal, how the goal would be measured, and which personnel would be responsible for implementing the goal with Student.  Further, the IEP indicated Parents would be informed of Student's progress through a progress report every trimester.

The goals drafted addressed Student's needs in reading decoding, reading fluency, reading comprehension, and math.  The evidence showed Student did not have

significant executive functioning deficits that impacted access to the curriculum, such that a goal was required in that area.  Thus, Irvine offered appropriate, measurable goals in all areas of need in the March 13, and May 8, 2020 IEPs.  These were Student's operable goals until March 2021, so Irvine offered Student appropriate goals for the 2020-2021 school year, through January 4, 2021.  Irvine prevailed on Issue 3(b).

## ISSUE 2(C) AND 3(C): STRUCTURED LITERACY PROGRAM

Student contends Irvine's offer of Directed English Language Arts in the June 3, 2019, March 13, and May 8, 2020 IEPs, was insufficient to address Student's dyslexia and other reading deficits, and that Irvine should have offered an intensive intervention program using an evidence-based, multisensory, structured reading program such as Orton-Gillingham.  Irvine contends the program offered in Directed English Language Arts was sufficient to address Student's reading deficits and allow Student to make progress.

In the June 3, 2019 IEP, Irvine offered Student placement at Sierra Vista Middle School, which included a class called Directed English Language Arts.  While this IEP is outside of the statute of limitations for this case, Irvine's offered program was still required to substantively offer Student a FAPE during the 2019-2020 school year. As such, this Decision will analyze whether Irvine offered Student an appropriate reading program during that time period.

An IEP is not required to include the specific instructional methodologies the school district will use to educate the child.  (34 C.F.R. § 300.320(d)(1); 71 Fed. Reg. 46,665 (Aug. 14, 2006).)  As long as a school district provides an appropriate education, methodology is left up to the district's discretion.  (*Rowley*, *supra*, 458 U.S. at p. 208.) Courts are ill-equipped to second guess reasonable choices that school districts have

made among appropriate instructional methods.  (*T.B. v. Warwick School Commission* (1st Cir. 2004) 361 F.3d 80, 84.)  A parent's disagreement with a school district's educational methodology is insufficient to establish an IDEA violation.  (*Carlson v. San Diego Unified School Dist.* (9th Cir. 2010, unpublished) 380 F. App'x 595; see also *Lachman v. Illinois State Bd. of Educ.* (7th Cir. 1988) 852 F.2d 290, cert. denied at 488 U.S. 925 [holding that parents do not have a right to compel a school district to provide a specific program or employ a specific methodology in providing for the education of a student with a disability].)

Student did not prove Irvine failed to offer an appropriate structured literacy program for the 2019-2020, and 2020-2021 school years.  Irvine offered Directed English Language Arts for 50 minutes each school day, in the June 3, 2019, March 13, and May 8, 2020 IEPs.  Directed English Language Arts was a special education class with students who were performing at least three grade levels behind in reading.  The class was taught by a credentialed special education teacher and typically did not exceed 15 students.  If there were more than six students in the class, an instructional aide would be added to assist the teacher.  The purpose of the class was to grow students' reading, writing, listening, and speaking skills.  The focus was on literacy development so students could access grade level content from their other classes.

The class's instructional model included a combination of direct instruction from the teacher, small group work, independent reading or writing activities, and computer-based reading intervention.  Instruction was individualized based on each student's literacy needs.  The pace of the class was slower than a general education English language arts class, but students were still exposed to grade-level curriculum standards with accommodations and other supports.  For example, if a seventh-grade general education English language arts class was reading a particular novel, the Directed

English Language Arts students may read the abridged version of the novel, which used simplified language, or may listen to the audiobook version.

Directed English Language Arts teachers relied on many different reading intervention strategies to address students' literacy needs, some were based on their training and experience as teachers, and others were computer-based programs. During both the 2019-2020, and 2020-2021 school years, Directed English Language Arts at Sierra Vista used two reading intervention programs called System 44 and Read 180.  When a student enrolled in the class, teachers administered a reading inventory assessment to obtain a student's lexile, or reading comprehension, level.  Students who had a lexile equivalent to a third-grade level, typically used System 44 and students performing above third grade level, typically used Read 180.  System 44 focused on the basic rules of language, including decoding, phonics, and fluency.  Read 180 focused more on morphology, or how words are formed, and comprehension.

System 44 and Read 180 are research-based literacy programs, although there is disagreement among experts on their effectiveness for students with learning disabilities.  Both programs encourage an instructional model that includes whole group teacher-led instruction, small group activities, computer-based lessons, and modeled and independent reading.  Teachers could monitor a student's progress on System 44 and Read 180 through computer-based software.

Students typically worked in stations in the Directed English Language Arts class. Each station would last approximately 20-25 minutes.  Stations included small group instruction, computer-based lessons using either System 44 or Read 180, and independent or partner reading.  During the 2019-2020 school year, the class met five times a week for 50 minutes each class.  Students worked on two different stations each class period.

In mid-March 2020, Irvine, along with most other school districts in California, closed as a result of the novel coronavirus, COVID-19.  Irvine provided instruction in a distance learning model from approximately April 2020, through the end of the 2019-2020 school year.  Irvine began the 2020-2021 school year using distance learning but switched to a hybrid learning model once deemed safe to do so.  During distance learning, Directed English Language Arts met online for 100 minutes a week and students were assigned independent work to do at home.  During hybrid learning, Directed English Language Arts met in-person for 90 minutes a week and students were assigned independent work to do at home.  During distance and hybrid learning, students were assigned System 44 or Read 180 for 40 minutes each day, which included 20 minutes each on computer-based lessons and independent reading.

At the time of the June 3, 2019 IEP team meeting, Student's reading level was between third and fourth grade.  Student was in seventh grade in the 2019-2020 school year, but chronologically was an eighth grader because Student repeated the sixth grade upon enrolling at Prentice.  Thus, Student was three years or more behind grade level in reading during the 2019-2020 school year, and placement in Directed English Language Arts would have been appropriate based on Irvine's description of the class.  At the time of the March, and May 2020 IEPs, Student's reading level was between third and fifth grade, still making placement in Directed English Language Arts appropriate.

Several Irvine witnesses, including school psychologist Roxanne Olsh and former Directed English Language Arts teacher Susan Santaniello, testified the reading intervention strategies used in Directed English Language Arts were effective for students with dyslexia and other reading challenges.  In Santaniello's opinion, Student's IEP goals could be worked on in Directed English Language Arts.  Both Olsh and Santaniello were highly experienced in their respective professions.  Olsh held a master's

degree in school counseling and psychology and had been a school psychologist with Irvine for 23 years. Santaniello held master's degrees in psychology and education with a focus on reading intervention and had a combined 15 years of experience as a general education and special education teacher. Also, Santaniello had five years of experience working as a private Orton-Gillingham reading and writing tutor.

Both Olsh and Santaniello were familiar with Student's educational needs because they attended and participated in the development of the June 3, 2019 IEP. In addition, Olsh observed Student at Prentice. Accordingly, Olsh and Santaniello were credible and their testimony was persuasive.

In November 2021, Student's expert, Dr. Marta Shinn, observed a class similar to Directed English Language Arts, called Practical English Language Arts, at Sierra Vista. Irvine discontinued Directed English Language Arts beginning in the 2021-2022 school year. Irvine also changed to block scheduling during the 2020-2021 school year, which meant Practical English Language Arts only met three times a week, as opposed to the five days Directed English Language Arts met. Dr. Shinn did not observe the students using the Read 180 program because they were working on a group writing assignment. The classroom teacher informed Dr. Shinn Read 180 was typically implemented for 20 minutes each class period using the computer-based component of the program. In Dr. Shinn's opinion, based on the observation of Practical English Language Arts, conversations with the teacher, and independent research on Read 180, Directed English Language Arts would not have been appropriate for Student because Read 180 was not an evidence-based program and Irvine did not implement the program according to the publisher's instructions. Specifically, Dr. Shinn stated Irvine should have been implementing Read 180 for at least 40 to 50 minutes a day. If appropriately

implemented, Dr. Shinn stated Read 180 could have been effective for Student, but that an Orton-Gillingham program would have been more effective.

Like Olsh and Santaniello, Dr. Shinn was highly experienced.  Dr. Shinn held a doctoral degree in psychology and a master's degree in school psychology and was both a licensed clinical and educational psychologist.  Dr. Shinn had four years of experience working as a school psychologist and over 10 years of experience working as a private psychologist.  While knowledgeable about reading deficits and interventions, Dr. Shinn's opinion about the appropriateness of Directed English Language Arts for Student was not as persuasive as Irvine's witnesses because Dr. Shinn's testimony was speculative and in hindsight.  The Practical Language Arts class Dr. Shinn observed was different from the Directed English Language Arts classes in the 2019-2020, and 2020-2021 school years, in terms of how frequently classes were held and how System 44 and Read 180 were implemented.  Dr. Shinn's speculation that a program similar to the one observed during the 2021-2022 school year would have been inappropriate in prior school years falls short of establishing that the actual programs offered would not have met Student's reading needs.  Thus, Student did not prove Directed English Language Arts was not implemented in accordance with the publisher's instructions in the 2019-2020, and 2020-2021 school years.

The evidence showed that Irvine offered Student a program during the 2019-2020, and 2020-2021 school years, that included a structured literacy program.  Directed English Language Arts was designed for students who, like Student, were significantly below grade level in reading.  The class relied on different types of instruction, all designed to address students' individual literacy deficits, while still exposing them to grade level content.  The class had a small student-to-teacher ratio and used research-

based programs System 44 and Read 180, in combination with other teaching strategies delivered by a credentialed special education teacher.

Even if a different program, such as Orton-Gillingham, would have been more effective for Student, Parents cannot dictate Irvine's instructional methodology as long as the proposed program is appropriate.  Because there was no persuasive evidence that proved Directed English Language Arts was inappropriate for the 2019-2020, and 2020-2021 school years, Student did not meet its burden on this issue.  Therefore, Irvine prevailed on Issues 2(c) and 3(c).

## ISSUES 2(D) AND 3(D): MODIFIED CURRICULUM

Student contends Irvine's offer of Directed English Language Arts and Directed Math in the June 3, 2019, March 13, and May 8, 2020 IEPs included teaching Student from a special education modified curriculum as opposed to teaching Student from the general education curriculum.  Student argued teaching Student using a modified curriculum would not allow Student to graduate from high school with a regular diploma.

Irvine contends its Directed English Language Arts and Directed Math classes offered general education curriculum with accommodations and modifications to help Student access grade level standards.  Irvine contends its offer to modify some of Student's instruction in reading, writing, and math was consistent with input received from Prentice on the level of support Student needed to access grade level curriculum.

Even though the June 3, 2019 IEP is outside of the statute of limitations, Irvine had a duty to substantively provide Student with a FAPE throughout the 2019-2020 school year.  Therefore, whether Irvine offered Student a modified curriculum during the statutory period of the case will be addressed.

Student did not prove Irvine offered Student a modified curriculum during the 2019-2020, or 2020-2021 school years.  In Student's May 8, 2018 IEP, the IEP team discussed Student's transition to middle school.  The IEP, under program modifications, stated that Student was to receive a modified curriculum for reading, writing, and math. This language is distinct from what appeared in the June 3, 2019, March 13, and May 8, 2020 IEPs.  In these IEPs, under program modifications, it stated Student was to receive curriculum for reading, writing, and math at Student's instructional level.  Additional items listed under program modifications were abridged or alternative versions of novels or reading materials, and shortened assignments to focus on mastery of key concepts.  There were also multiple program accommodations offered that were designed to help Student access the general education curriculum.

Program accommodations allow a student to access grade level standards. Program modifications change the grade level standard and ask the student to complete a task that is at a lower grade level.  For example, if the grade level standard is for the student to write a paragraph, an accommodation may include the use of graphic organizers to write the paragraph, whereas a modification may have the student write a sentence or draw a picture instead of writing the paragraph.  Whether an instructional support is characterized as an accommodation or modification depends on the subject area and the grade level standard being worked on.

Receiving program modifications can impact a student's ability to obtain a high school diploma if those modifications impact a student's ability to achieve proficiency on grade level standards.  At Irvine, once a student entered seventh grade, the IEP team discussed whether the student would be on a diploma or certificate of completion track. This discussion was revisited each year.  A certificate of completion means the student

has completed their educational career but has not met the standards to receive a high school diploma.

The June 2019, March, and May 2020 IEPs included multiple accommodations and modifications to help Student access the general education curriculum.  Student's instructional level was different in English language arts, math, science, and history, so teachers could accommodate or modify the lesson based on Student's needs.  For example, if Student could not meet a grade level standard, even with the use of accommodations, the teacher may use a modification to help the Student reach the grade level standard.

The instruction Student received at Prentice during the 2019-2020, and 2020-2021 school years, was heavily accommodated.  While the Prentice teachers taught grade level standards, they would often use curriculum that corresponded to Student's instructional level, which was often below grade level, and then, spiral up the lesson to reach grade level standards.  For example, Student's math teacher at Prentice during the 2019-2020 school year, Cindy Shaw, taught on a continuum of math standards, which included reviewing skills taught at earlier grade levels and then, adding on new concepts.  Depending on the standard being taught, it could take several weeks to spiral up to grade level.  In educational specialist Hill's opinion, Prentice modified Student's instruction because even with the level of support Prentice provided, Student was not proficient in grade level standards.

For the 2019-2020, and 2020-2021 school years, Irvine offered Student placement in a combination of general education and special education classes.  Two of the special education classes offered were called Directed English Language Arts and Directed Math.  As discussed in Issues 2(c) and 3(c), Directed English Language Arts offered grade level curriculum, but at a slower pace, to students who were three or more years behind

grade level. Directed Math was structured the same way. All students in the classes were exposed to grade level standards, but some students were not expected to demonstrate mastery of those standards. Instruction was differentiated depending on an individual student's needs using the program accommodations or modifications in their IEP. In Directed Math, students used the same textbook as the general education math class.

The evidence showed that Irvine's proposed program for the 2019-2020, and 2020-2021 school years, offered Student special education classes that taught grade level standards using the general education curriculum, with the use of program accommodations and modifications available to help Student access that curriculum. This is not equivalent to Student being placed solely on a modified curriculum, which would not expose Student to grade level standards or the general education curriculum. The way in which teachers in Directed English Language Arts and Directed Math taught grade level standards was similar to how Prentice teachers taught Student, and Parents did not dispute the effectiveness of Prentice's program. Further, the June 2019, March, and May 2020 IEPs did not offer Student a modified curriculum and did not indicate Student was on a certificate of completion track. Therefore, Irvine prevailed on Issues 2(d) and 3(d).

ISSUES 2(E), 2(F), 2(G), 2(H), 3(E), 3(F), AND 3(G): PLACEMENT

Student contends Irvine predetermined its offer of placement in the June 3, 2019, March 13, and May 8, 2020 IEPs, and did not consider a continuum of placement options, including continuing Student's placement at a nonpublic school. Further, Student contends Irvine's placement offers for the 2019-2020, and 2020-2021 school years, on a regular high school campus were not appropriate to address Student's needs and that Student required placement in a nonpublic school for students with learning

disabilities, a structured literacy program, and access to unmodified curriculum.  Finally, Student contends Irvine should have offered a reading program during extended school year 2020.

Irvine contends its offer of special education and general education classes on a regular high school campus at Student's school of residence was FAPE.  Irvine contends it considered Student's academic and functional needs, input from Parents and Prentice staff, and the least restrictive environment when making its placement offer.  Further, Irvine contends it offered Student extended school year in 2020.

Any allegations that the June 3, 2019 IEP procedurally denied Student a FAPE, are outside of the statute of limitations and will not be addressed in this Decision.  However, claims that Irvine's offered placement substantively denied Student a FAPE during the 2019-2020 school year will be addressed.  Accordingly, Issues 2(f) and 2(g) are outside of the statute of limitations and Irvine prevailed on those issues.

Parents must be members of any group making decisions on the educational placement of their child.  (20 U.S.C. § 1414(e); 34 C.F.R. § 300.327; Ed. Code, § 56342.5.)  When considering placement decisions, a school district must educate a child in the least restrictive environment, which means to the maximum extent appropriate, children with disabilities are educated with nondisabled peers; and that special classes or separate schooling occur only if the nature or severity of the child's disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  (20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a).)

Further, an IEP must state whether extended school year services are offered.  (Ed. Code, § 56345, subd. (b)(3).)  Extended school year services must be provided if the IEP team determines they are necessary for a student to receive FAPE.  (34 C.F.R.

§ 300.106(a)(2).)  Extended school year services means special education and related services that are provided beyond the normal school year, in accordance with the student's IEP, and at no cost to parents.  (34 C.F.R. § 300.106(b).)

In determining the educational placement of a child with a disability, a school district must ensure that:

- placement decisions are made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options;
- placement decisions satisfy least restrictive environment requirements;
- placement is determined annually, is based on the child's IEP, and is as close as possible to the child's home;
- unless the IEP specifies otherwise, the child attends the school that he or she would if nondisabled;
- in selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and
- a child is not removed from age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.  (34 C.F.R. § 300.116; Ed. Code, § 56342.)

A school district's predetermination of an IEP seriously infringes on parental participation in the IEP process, which constitutes a procedural denial of FAPE.  (See *Target Range, supra,* 960 F.2d at pp. 1483-1485, superseded by statute on other grounds by IDEA Amendments of 1997 (citations omitted).)  Predetermination occurs when the school district makes its determination before the IEP team meeting and enters the meeting with a take it or leave it position.  (See *Ms. S. ex rel G. v. Vashon*

31

*Island School Dist.* (9th Cir. 2003) 337 F.3d 1115, 1131, superseded by statute on other grounds (citation omitted) [A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, then simply presents the IEP to the parent for ratification.].)  Developing an IEP that does not fully conform to a parent's wishes does not mean the school district engaged in predetermination. (*Gregory K., supra,* 811 F.2d at p. 1314.)

In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program.  (*Gregory K., supra,* at 811 F.2d at p. 1314.)

## IRVINE OFFERED STUDENT APPROPRIATE PLACEMENT FOR THE 2019-2020 SCHOOL YEAR

Student did not prove Irvine's placement offer in the June 3, 2019 IEP, for the 2019-2020 school year and extended school year 2020, was inappropriate.  As discussed, Student attended Prentice when Irvine held the June 3, 2019 IEP.  In making an offer of placement for Student, Irvine relied on input from Prentice and Parents, as well as prior assessment data.

Irvine offered placement at Sierra Vista, Student's school of residence, in three special education classes per day, which included Directed English Language Arts, Directed Math, and Directed Study Skills.  The English and math classes, as discussed, offered grade level curriculum taught by a credentialed special education teacher, in a small class setting and at a slower pace, using research-based interventions, and the accommodations and other supports in Student's IEP.  Directed Study Skills was taught by a credentialed special education teacher and was designed to help students with executive functioning skills like organization, time management, being prepared for

class, homework support, and work completion.  Additionally, students could work on outstanding assignments and receive additional support on IEP goals.

Irvine also offered placement in three general education classes per day, which included Collaborative Science, Collaborative History, and physical education.  These classes were taught by a credentialed general education teacher.  In the Collaborative classes, there was either a special education teacher co-teaching, or an instructional assistant to support students that required special education support.  Student would have received specialized academic instruction in both the special education and general education academic classes.  Irvine also offered specialized academic instruction and related services during extended school year in Summer 2020, consistent with Student's IEP and at no cost to Parents.

Several Irvine witnesses testified that Student could receive a FAPE with the program Irvine offered at Sierra Vista.  In special education director Jennifer O'Malley's opinion, Student's IEP should be implemented on a comprehensive campus because Student could receive the structure of a special education program and also participate with general education peers in general education classes.  In O'Malley's opinion, a nonpublic school was not the least restrictive environment for Student.  In school psychologist Olsh's opinion, Student did not require a school setting more restrictive than Sierra Vista because Student's goals could be implemented at Sierra Vista and Student would have access to general education peers.  In special education teachers Andrew Lewis's and Jacqueline Kron's opinions, Student's reading, writing, and math goals could be implemented in Directed English Language Arts and Directed Math.  Their testimony was consistent with each other and with other Irvine witnesses.  Further, O'Malley, Olsh, and Kron attended the June 3, 2019 IEP and were familiar with Student's educational background.  Thus, their opinions were credible and persuasive.

In Dr. Shinn's opinion, Sierra Vista was not an appropriate placement for Student because Student required a small class setting for the entire school day, with instruction tailored to help Student with executive functioning skills using accommodations and other supports.  Dr. Shinn did not believe Student could keep pace with the general education classes.  Student's science teacher at Prentice, Kim Zippwald, also did not believe Student would perform well in a large general education class.  In Parent's opinion, Irvine's placement offer was inappropriate because Student could not learn in the Collaborative or Directed class environments due to their large class size of 30 and 15 students, respectively, and the lack of an evidence-based program to address Student's reading deficits.  Parent was not concerned with least restrictive environment because Student had not developed friendships with any typically developing peers.

Dr. Shinn's, Zippwald's, and Parent's opinions regarding Irvine's proposed placement were not as persuasive as the opinions of Irvine's witnesses and other evidence.  Both Zippwald and Student's history teacher at Prentice, Joshua Tittelfitz, testified Student could access grade level content in their classes with modifications and accommodations.  Science and history were the two general education classes Irvine offered with the use of specialized academic instruction from a special education teacher or instructional assistant, and with accommodations and other supports. Moreover, OAH's February 2019 decision determined that Student made progress in all areas in the regular education environment and could be satisfactorily educated with non-disabled grade level peers with the use of supplementary aides and services.  (Cal. Office of Admin. Hrgs. (February 19, 2019) OAH Case Nos. 2018080938 and 2018080860, at p. 71.)  This proves that Student could, and had in the past, made progress in a general education setting.

Student's executive functioning skills were appropriately address through Directed Study Skills and accommodations tailored to address executive functioning. Student's accommodations would have been implemented across settings throughout the school day.  Additionally, as discussed, Directed English Language Arts offered a research-based literacy program and appropriate teaching strategies to address Student's reading deficits.  Finally, pursuant to the IDEA, Irvine had an obligation to consider the least restrictive environment when offering placement to Student, even if Parents did not believe it was important.

The appropriateness of a special education program is often determined in hindsight, where a student has participated in the offered program and the student's academic and functional progress can be analyzed.  However, in this case, Student never enrolled at Sierra Vista and Irvine never had the opportunity to implement the placement and services in the June 3, 2019 IEP, so any discussion of Student's progress or lack thereof in the proposed program is speculative.  Instead, the analysis must focus on whether Irvine's offered placement was designed to meet Student's needs, whether Student's IEP could be implemented in the proposed placement, and whether the placement was reasonably calculated to provide Student with educational benefit in the least restrictive environment.  This Decision finds that all three criteria were met.

Student's needs were established through the present levels of performance and annual goals in the June 3, 2019 IEP.  The IEP team determined Student had areas of need in reading, math, writing, anxiety, and social or pragmatic language, which were addressed through goals the team developed.  The team also identified several accommodations that Student and staff could utilize to help support Student's learning. Irvine's witnesses persuasively testified that Student's goals and proposed program could have been implemented at Sierra Vista.  Finally, at Sierra Vista, Student had the

opportunity to interact with nondisabled peers and to learn in the general education environment.

Because the proposed placement was designed to meet Student's needs, comported with Student's IEP, and Student showed the ability to make progress in a general education setting with the appropriate supports, Irvine's proposed placement was reasonably calculated to provide Student with educational benefit appropriate in light of Student's circumstances, in the least restrictive environment for the 2019-2020 school year, including extended school year 2020.  Thus, Irvine prevailed on Issues 2(e) and 2(h).

## IRVINE OFFERED STUDENT AN APPROPRIATE PLACEMENT FOR THE 2020-2021 SCHOOL YEAR

Student did not prove Irvine failed to offer an appropriate placement for the 2020-2021 school year.  Student's needs did not change between the June 3, 2019, and March 13, 2020 IEP, which offered an educational program for the 2020-2021 school year.  Student still required support in reading, writing, math, social emotional, and pragmatic language, and Irvine developed goals in these areas with the input of Prentice staff and Parents.  Irvine continued to offer the same placement with a combination of Directed and Collaborative classes, along with accommodations, related services, and other supports.

The only significant change that affected the 2020-2021 school year was the outbreak of COVID-19, and Irvine's implementation of distance and hybrid learning.  At the May 8, 2020 IEP team meeting, the IEP team considered the changed circumstances COVID-19 caused.  Irvine, in consultation with Prentice staff and Parents, offered the same placement, goals, services, and accommodations, all of which were available

through distance learning at Sierra Vista.  The only change to Irvine's proposed placement, was in the delivery model, and Student did not prove an inability to receive educational benefit with online and hybrid in-person services implemented by Irvine's credentialed staff.  In sum, there was no evidence presented that showed Student's needs had changed, such that Irvine's proposed placement at Sierra Vista was no longer appropriate for the 2020-2021 school year.  Irvine prevailed on Issue 3(e).

## IRVINE DID NOT PREDETERMINE STUDENT'S PLACEMENT FOR THE 2020-2021 SCHOOL YEAR

Student did not prove Irvine predetermined its placement offer in the March or May 2020 IEPs written for the 2020-2021 school year.  There was no evidence that Irvine's staff colluded before the IEP team meetings to determine Student's placement. Irvine collaborated with Prentice staff and Parents throughout the IEP process.  Parents actively participated in the IEP process and the IEP team discussed placement at the meetings, including Parents' desire to keep Student at Prentice and Irvine's position that Student should be in the least restrictive environment.

As discussed above, Irvine considered Student's present levels, goals, and services when making its placement offer.  Further, Student's needs did not change during the 2019-2020 school year, such that Irvine had reason to offer a different placement. Irvine's position that Student's continued enrollment at Prentice was inappropriate and did not constitute the least restrictive environment, did not create a take it or leave it position.  Similarly, Irvine's refusal to offer Prentice as Student's placement, did not mean Irvine engaged in predetermination.

Thus, Irvine prevailed on Issue 3(f).

## ISSUE 3(G) IS OUTSIDE OF THE RELEVANT TIME PERIOD IN THIS CASE

Issue 3(g) seeks a determination that the placement offered for the 2020-2021 extended school year was inappropriate.  Extended school year services for that school year would have occurred in Summer 2021, which is outside of the relevant time period for this case, which ended on January 4, 2021.  Also, the effective time period of the March, and May 2020 IEPs, ended in March 2021, so the offer for extended school year services in those IEPs referred to Summer 2020.  Because this issue, as written, is limited to the 2020-2021 school year, and extended school year did not occur during the relevant time period in this case, it will not be decided in this Decision.  Accordingly, neither party prevailed on Issue 3(g).

## ISSUE 2(I): FAILURE TO FILE FOR DUE PROCESS

Student contends Irvine denied Student a FAPE during the 2019-2020 school year, by not filing for due process to defend its June 3, 2019 IEP, which Parents did not consent to.  Student contends Irvine should have filed for due process as early as July 16, 2019, when Irvine denied Parents' request to fund Student's placement at Prentice for the 2019-2020 school year.

Irvine contends Parents unilaterally placed Student at Prentice for the 2019-2020 school year, and therefore, it did not have a duty to file for due process.  Further, Irvine contends Student suffered no prejudice by Irvine not filing for due process because Prentice was Parents' preferred placement.

If a parent consents, in writing, to the receipt of special education and related services for their child but does not consent to all of the components of the IEP, those components of the program to which the parent has consented must be implemented

without delay.  (Ed. Code, § 56346, subd. (e).)  If a school district determines that the proposed special education program component to which the parent does not consent is necessary to provide a FAPE to the child, a due process hearing must be initiated by the public agency.  (Ed. Code, § 56346, subd. (f).)  California is one of few states that places an affirmative duty on school districts to file for due process when there is a dispute regarding what constitutes FAPE for a child.

The Ninth Circuit set forth a two-prong test to determine a school district's obligation to file for due process.  First, the school district must determine whether the proposed special education program component to which the parent does not consent is necessary to provide a FAPE.  Second, if the disputed component is determined to be necessary, the school district must initiate a due process hearing.  (*I.R. ex rel. E.N. v. Los Angeles Unified School Dist.* (9th Cir. 2015) 805 F.3d 1164, 1169.)  Once the school district determines that the component is necessary, and that the parents will not agree to it, the district cannot opt to hold additional IEP team meetings or continue the IEP process in lieu of initiating a due process hearing.  (*Ibid.*)  Rather, the school district must initiate a due process hearing expeditiously.  (*Ibid.*)  The reason for this urgency is that it is the child who suffers in the meantime.  (*I.R., supra*, at p. 1170.)  The court in *I.R.* did not include, as an exception to filing for due process, a parent's decision to unilaterally place their child in private school, or any considerations as to whether Student would be prejudiced.

A school district's failure to comply with a procedural requirement, such as the requirement of California Education Code section 56346, subdivision (f), denies a child a FAPE when the procedural inadequacy results in the loss of educational opportunity or causes a deprivation of educational benefits.  (*M.M. v. Lafayette School Dist.* (9th Cir.

2014) 767 F.3d 842, 852 (quoting *N.B. v. Hellgate Elementary School Dist.* (9th Cir. 2008) 541 F.3d 1202, 1207).)

The terms of the June 3, 2019 IEP are outside of the relevant time period in this case, which began on July 30, 2019.  However, because the June 3, 2019 IEP was Student's operative IEP during the 2019-2020 school year, this Decision considers whether Irvine should have filed a due process hearing request at any time, from July 30, 2019, through the end of the 2019-2020 extended school year, to defend its offer of FAPE in that IEP.

Student proved that Irvine's failure to file a due process hearing request to defend its offer of FAPE in the June 3, 2019 IEP, resulted in a denial of FAPE to Student. Parents never consented to any portion of the June 3, 2019 IEP.  On July 16, 2019, Irvine sent Parents a prior written notice letter denying Parents' request for Irvine to fund Student's placement at Prentice for the 2019-2020 school year.  Irvine stated in the letter that the educational program offered in the June 2019 IEP provided a FAPE in the least restrictive environment and the restrictiveness of a nonpublic school setting, such as Prentice, was not necessary or appropriate for Student.  This statement shows Irvine believed its placement offer in the June 2019 IEP was necessary to provide Student with a FAPE, and thus, satisfied the first prong of *I.R.*

However, Irvine never followed through with the second prong in *I.R.*, which was to file for due process.  Instead, Student filed for due process twice, first on August 28, 2019, and then on December 11, 2019.  Each time Student sought to challenge the appropriateness of Irvine's FAPE offer in the June 2019 IEP, among other issues. Ultimately, Student dismissed both cases without prejudice.  Student's due process filings were sufficient to put Irvine on notice that Parents did not plan to consent to

Irvine's proposed placement.  Instead of filing for due process, Irvine opted to continue the IEP process, as evidenced by the March 13, 2020 IEP team meeting.

In *I.R.*, a parent of child already eligible to receive special education, who did not consent to all portions of the IEP for more than a year, requested a due process hearing to challenge the school district's offer of FAPE.  In the request, the parent also alleged the school district's failure to file for due process to defend its offer of FAPE, in accordance with California Education Code section 56346, subdivision (f), denied the child a FAPE.  The Ninth Circuit rejected the school district's argument that it delayed filing for due process because it was trying to resolve the disagreement through the IEP process.  Instead, the court held the school district's failure to initiate a due process hearing directly resulted in clear injury to the student because the student remained in an inappropriate program for longer than should have been the case.

The facts in this case are similar to *I.R.*, in that Parents previously consented to Student receiving special education, did not consent to Irvine's proposed IEP, and ultimately requested multiple due process hearings to challenge Irvine's offer of FAPE.  Like the school district in *I.R.*, instead of initiating a due process hearing, Irvine attempted to resolve the parties' disagreement through the IEP process.  As a result, Student remained at Prentice, a school Irvine maintained was inappropriate because Student was not educated with nondisabled peers, for the 2019-2020, and a portion of the 2020-2021 school years.

Pursuant to *I.R.*, Irvine had a duty to file for due process to defend its June 3, 2019 IEP from at least August 28, 2019, when Parents filed the first due process hearing request challenging the June 2019 IEP.  Irvine's failure to file for a due process hearing resulted in a procedural violation.  By not filing for due process, Irvine took advantage of the fact that Parents were paying for Prentice, and deprived Student of a

FAPE, which includes special education and related services at public expense.  Irvine was responsible for providing Student with a FAPE, not Parents.  Accordingly, Irvine denied Student a FAPE when it failed to file for due process to defend its IEP offer and allowed Student to remain in a placement Irvine believed was inappropriate for a year and a half.  Student prevailed on Issue 2(i).

## ISSUE 3(H): TIMELINESS OF STUDENT'S TRIENNIAL IEP

Student argues Irvine should have completed Student's triennial IEP by January 7, 2021, and that holding the IEP over several dates beyond January 7, 2021, resulted in a denial of FAPE to Student.  Irvine argues the Student's triennial IEP was timely held.

School districts must review a child's IEP at least once a year, to determine whether the annual goals are being achieved.  (20 U.S.C. § 1414(d)(4)(A)(i).)  School districts must reevaluate a student at least once every three years, unless the school district and parents agree that a reevaluation is unnecessary.  (20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2).)  After the reevaluation is completed, the IEP team must meet to review the results and make recommendations regarding student's special education program.  (20 U.S.C. 1414(c)(1); 34 C.F.R. § 300.306.)  The IDEA does not specifically require a triennial IEP.

Student did not prove Irvine failed to timely complete Student's three-year reevaluation or to hold an IEP team meeting to review the reevaluation results.  Irvine completed a three-year reevaluation of Student and held an IEP on January 8, 2018.  Based on this date, Student's next three-year reevaluation was due by January 8, 2021.  Irvine conducted a three-year reevaluation of Student in November 2020, and held IEP team meetings over several dates, beginning on November 12, 2020.  Therefore, Irvine

was compliant with IDEA's procedures when it timely held Student's three-year reevaluation and IEP team meeting to review the results in November 2020. Irvine prevailed on Issue 3(h).

## ISSUES 4 AND 5: NOVEMBER 12, 2020 MULTIDISCIPLINARY ASSESSMENT

Student argues Irvine's November 12, 2020 multidisciplinary assessment of Student was inadequate. Student argues Irvine did not appropriately assess Student's cognitive and academic abilities. Specifically, Student argues Irvine should not have reported Student's full intellectual quotient score because there was significant scatter on the subtests that made up the score. Further, Student argues Irvine incorrectly scored the academic assessment. Finally, Student argues Irvine should have evaluated Student's executive functioning skills.

In its closing brief, Student argued Irvine failed to assess Student in the areas of visual motor integration and autism. Student also argued Irvine inappropriately used the pattern of strengths and weaknesses model when determining Student did not qualify for special education as a student with a specific learning disability. However, the complaint did not allege, and Student did not raise at the prehearing conference, any issues related to these allegations. Student's complaint alleged two specific inadequacies with the November 2020 assessment, the improper use of Student's full scale intelligence quotient and Irvine's failure to adequately assess Student's executive functioning. Irvine did not consent at any time to amending the issues for hearing. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i) [the party requesting the hearing may not raise issues at the due process hearing that were not raised in the complaint unless the other party agrees].) Accordingly, this Decision will not address whether Irvine failed to assess visual motor integration or autism, or whether Irvine

inappropriately relied on a pattern of strengths and weaknesses in determining Student did not have a learning disability.

Irvine argues its assessment was comprehensive and met all legal requirements under the IDEA.

School district evaluations of students with disabilities under the IDEA serve two purposes. They identify students who need specialized instruction and related services because of an IDEA-eligible disability and help IEP teams identify the special education and related services the student requires. (34 C.F.R. §§ 300.301 and 300.303.) In California, evaluations are referred to as assessments. (Ed. Code, § 56302.5.) The terms evaluation and assessment are used interchangeably in this Decision.

Once a school district identifies a student as a child with a disability in need of special education and related services, and a parent consents to services, the school district has an ongoing duty to evaluate the needs of that student. Specifically, school districts must conduct a reevaluation if the student's educational or related service needs, including improved academic achievement and functional performance, warrant a reevaluation, or if the student's parents or teacher request a reevaluation. (20 U.S.C. § 1414(a)(2)(A); 34 C.F.R. § 300.303(a).) Irrespective of who initiates the request, the school district must obtain informed consent from the parent before conducting an evaluation. (20 U.S.C. § 1414(a)(1)(D); 34 C.F.R. § 300.300(a).)

Within 15 days of a student's referral for assessment, the school district must provide a proposed assessment plan to the parents. (Ed. Code, § 56321(a).) A copy of the notice of parent's rights must be attached to the assessment plan. (*Id.*) The proposed assessment plan must be in a language easily understood by the general public and must be in the parent's native language. It must explain the types of

assessments to be conducted and must state that no IEP will result from the assessment without parental consent.  (Ed. Code, § 56321(b).)

In conducting an evaluation, the school district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent.  (20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304(b)(1).)  The school district must not use any single measure or assessment as the sole criterion for determining whether the child is a child with a disability or determining the appropriate educational program for the child. (20 U.S.C. § 1414(b)(2)(B); 34 C.F.R. § 300.304(b)(2).)  Assessments and other evaluation materials must not be discriminatory on a racial or cultural basis and must be administered in the language and form most likely to yield accurate information. (20 U.S.C. § 1414(b)(3)(A)(i) and (ii); 34 C.F.R. § 300.304(c)(1)(i) and (ii).)

Assessments and other evaluation materials must be administered in accordance with the publisher's instructions and be used for valid and reliable purposes.  (20 U.S.C. § 1414(b)(3)(A)(iii) and (v); 34 C.F.R. § 300.304(c)(1)(iii) and (v).)  Assessments must be sufficiently comprehensive to identify all the child's special education and related service needs, whether or not commonly linked to the disability category of the child.  (34 C.F.R. § 300.304 (c)(6).)  Further, the student must be assessed in all areas related to suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. (20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c)(4).)

Assessments must be administered by trained and knowledgeable persons, who are competent to conduct such assessments.  (20 U.S.C. § 1414(b)(3)(A)(iv); Ed. Code, §§ 56320, subd. (b)(3), and 56322.)  A credentialed school psychologist must conduct any psychological assessments.  (Ed. Code, § 56324.)

Assessors must prepare a written report of the assessment results that includes:

1.  whether the student may need special education and related services;

2.  the basis for that determination;

3.  the relevant behavior noted during the observation of the student in an appropriate setting;

4.  the relationship of that behavior to the student's academic and social functioning;

5.  the educationally relevant health and development, and medical findings;

6.  for students with learning disabilities, whether there is such a discrepancy between achievement and ability that it cannot be corrected without special education and related services;

7.  a determination concerning the effects of environmental, cultural, or economic disadvantage, where appropriate; and

8.  the need for specialized services, materials, and equipment for students with low incidence disabilities.  (Ed. Code, § 56327.)

Parents must receive a copy of the evaluation report.  (20 U.S.C. § 1414(b)(4)(B); 34 C.F.R. § 300.306(a)(2).)

On November 18, 2021, Student and Irvine filed a joint stipulation of facts related to the multidisciplinary report.  Specifically, the parties agreed that:

1.  Irvine provided Parents with notice of the evaluation procedures Irvine proposed to conduct as part of the assessment;

2.  Irvine used technically sound instruments that assessed the relative contribution of cognitive, and behavioral factors, in additional to physical or developmental factors;

3. the assessments and other evaluation materials were selected and administered so as not to be discriminatory on a racial or cultural basis;

4. the assessments were administered in Student's native language;

5. the assessments and evaluation materials were used for the purposes for which the assessments or measures are valid and reliable;

6. the assessors were trained, qualified, and knowledgeable to administer the assessments; and

7. the assessments and other evaluation materials, with the exception of the academic assessment, were administered in accordance with any instructions provided by the test publisher.

Irvine's November 12, 2020 multidisciplinary assessment was appropriately conducted and met all legal requirements of the IDEA.  Parent consented to Irvine conducting a three-year evaluation of Student on September 23, 2020.  The assessment included cognitive and academic testing, a review of Student's behavior, adaptive skills, and social emotional functioning, and a speech and language evaluation.

Irvine school psychologist Dr. Angela Weedn conducted the cognitive testing and review of Student's behavior, adaptive skills, and social emotional functioning. Dr. Weedn had worked as a school psychologist for Irvine for approximately 14 years. For seven of those years, Dr. Weedn served as lead psychologist, which included oversight and professional development of 40 school psychologists.  Dr. Weedn held a doctoral degree in educational psychology, was a licensed educational psychologist and a board-certified neuropsychologist, and held a California credential that authorized psychological testing.  Dr. Weedn was highly qualified as a school psychologist.

Irvine educational specialist Hill conducted the academic testing.  Hill was responsible for conducting assessments of Irvine's students who attended nonpublic or

private schools and held that position for approximately five years.  Prior to that, Hill was

a special education teacher in Irvine and other school districts for approximately 11

years.  In that role, Hill provided direct instruction to students with mild to severe

disabilities.  Hill held a California educational specialist credential to teach students with

disabilities and conduct assessments.  Hill was a highly qualified special education

teacher.

Irvine speech and language pathologist Meghan Sparling conducted the speech

and language evaluation.  Sparling served as lead speech and language pathologist for

Irvine, which included clinical supervision, management of staff, and professional

development.  Sparling had worked for Irvine for approximately 14 years.  Sparling held

a master's degree in speech and language pathology and was licensed by the American

Speech Language Hearing Association and the California Speech and Language

Pathology Board.  Sparling was a highly qualified speech and language pathologist.

The 90-page multidisciplinary assessment report included an extensive review of

Student's educational background, including academic performance and prior testing.

The assessors used a variety of assessment tools and strategies to gather information

about Student, including input from Parents, input from Student's teachers at Prentice,

observation and interview of Student, and informal and standardized assessments.  The

report explained each assessment tool used and analyzed Student's performance in

each area.

Irvine's assessors did not use any single measure or assessment to determine

Student's eligibility for special education or to make recommendations for Student's

educational program.  For example, Dr. Weedn administered one standardized

assessment to assess Student's cognitive processing, and when the results indicated

Student had working memory deficits, Weedn administered another assessment tool to

further assess this area.  Similarly, Hill administered a test of academic achievement to obtain information about Student's academic functioning in reading, writing, and math. When that test's results showed Student had significant deficits across academic areas, Hill administered additional assessments that targeted each academic area separately. Giving multiple assessments allowed the assessors to analyze different data points when considering Student's special education needs.

Student's assertion that Irvine solely relied on one intelligence quotient to determine Student's cognitive abilities is not persuasive.  Dr. Weedn credibly and persuasively refuted this assertion.  Dr. Weedn looked at all processing areas that combined to make up Student's full scale intelligence quotient, including the scatter between scores.  In Dr. Weedn's opinion, all cognitive processing scores must be considered when determining a student's cognitive ability.  Dr. Weedn's opinion was consistent with Student's expert, psychologist Dr. Chris Davidson, who testified that when determining a student's strengths and weaknesses, all subtests should be considered and not just the full-scale intelligence quotient.

Student's assertion that Hill incorrectly scored the academic assessment was not persuasive.  At hearing, Student identified one score on one subtest of the academic achievement test that Hill may have reported incorrectly.  However, Hill could not recollect whether the score had been reported and if so, Hill credibly and persuasively testified that it was an error.  Nevertheless, Student did not prove that misreporting a single score on one subtest impacted the validity of the academic assessment.

The combined testing from Dr. Weedn, Hill, and Sparling assessed Student in all areas of suspected disability and was sufficiently comprehensive to identify Student's special education and related service needs.  Dr. Weedn assessed Student's cognitive abilities, behavior, attention, anxiety, self-image, and adaptive skills.  Hill assessed all

areas of academic functioning.  Sparling assessed Student's speech and language abilities, including expressive and receptive language, and social or pragmatic language. Each assessor relied on Student's prior assessments, input from the Prentice teachers and speech and language pathologist, and input from Parents to determine in which areas to assess Student.

Student's assertion that Irvine should have administered a specific test measure to assess executive functioning skills was not persuasive.  Executive functioning has both cognitive and behavioral components.  Deficits in executive functioning may impact cognitive processes involving problem solving, processing speed, fluid reasoning, and working memory.  Behaviorally, executive functioning deficits may impact the ability to plan and initiate tasks, stay organized, and self-motivation.  Dr. Weedn indirectly assessed Student's cognitive executive functioning skills through the fluid reasoning subtest on the cognitive assessment.  Dr. Weedn assessed Student's behavioral executive functioning skills through a test measure designed to assess attention deficit hyperactivity disorder and other related disorders.  Two of Student's teachers and Parents completed rating scales and answered questions regarding Student's behavior at school and at home.  Neither Student's teachers, nor Parents reported significant concerns with executive functioning on this measure that would have triggered Dr. Weedn's need to give a separate test measure to specifically assess executive functioning.

The report included all areas required under the IDEA.  It included an explanation of each area of eligibility that Irvine considered and whether Student met the criteria for each.  The assessors considered whether Student met the eligibility criteria for other health impairment, specific learning disability, language and speech disorder, emotional disturbance, and intellectual disability.  It included behavioral observations of Student

from each of the assessors and how Student's behavior impacted educational performance.  It also included a review of Student's relevant health and developmental information.  Irvine provided a copy of the report to Parents and reviewed the report at several IEP team meetings, beginning on November 12, 2020.

Student did not prove the November 12, 2020 multidisciplinary assessment was inappropriately conducted.  Irvine proved the assessments and resulting report were legally compliant under the IDEA.  Thus, Irvine prevailed on Issues 4 and 5.

## CONCLUSIONS AND PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.  The parties prevailed on the issues as follows:

1.  On Issue 1:
    a.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by failing to timely convene an annual IEP team meeting.  Irvine prevailed on Issue 1(a).
    b.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by failing to implement Student's stay put placement.  Irvine prevailed on Issue 1(b).
    c.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by failing to offer appropriate, measurable goals in all areas of need.  Irvine prevailed on Issue 1(c).

d.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by failing to offer an appropriate structured literacy program.  Irvine prevailed on Issue 1(d).

e.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by offering a modified curriculum.  Irvine prevailed on Issue 1(e).

f.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by failing to offer appropriate placement.  Irvine prevailed on Issue 1(f).

g.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by predetermining Student's placement.  Irvine prevailed on Issue 1(g).

h.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by failing to consider a continuum of placement options.  Irvine prevailed on Issue 1(h).

i.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including extended school year, by failing to offer appropriate extended school year placement.  Irvine prevailed on Issue 1(i).

j.  Student did not prove Irvine denied Student a FAPE from January 8, 2019, through the end of the 2018-2019 school year, including

extended school year, by failing to file a request for due process hearing.  Irvine prevailed on Issue 1(j).

2.  On Issue 2:

a.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by failing to implement Student's stay put placement.  Irvine prevailed on Issue 2(a).

b.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by failing to offer appropriate, measurable goals in all areas of need.  Irvine prevailed on Issue 2(b).

c.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by failing to offer an appropriate structured literacy program.  Irvine prevailed on Issue 2(c).

d.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by offering a modified curriculum.  Irvine prevailed on Issue 2(d).

e.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by failing to offer an appropriate placement.  Irvine prevailed on Issue 2(e).

f.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by predetermining Student's placement.  Irvine prevailed on Issue 2(f).

g.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by failing to consider a continuum of placement options.  Irvine prevailed on Issue 2(g).

    h.  Student did not prove Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by failing to offer appropriate extended school year placement.  Irvine prevailed on Issue 2(h).

    i.  Student proved Irvine denied Student a FAPE during the 2019-2020 school year, including extended school year, by failing to file a request for due process hearing.  Student prevailed on Issue 2(i).

3.  On Issue 3:

    a.  Student did not prove Irvine denied Student a FAPE from the start of the 2020-2021 school year, through January 4, 2020, by failing to implement Student's stay put placement.  Irvine prevailed on Issue 3(a).

    b.  Student did not prove Irvine denied Student a FAPE from the start of the 2020-2021 school year, through January 4, 2020, by failing to offer appropriate, measurable goals in all areas of need.  Irvine prevailed on Issue 3(b).

    c.  Student did not prove Irvine denied Student a FAPE from the start of the 2020-2021 school year, through January 4, 2020, by failing to offer an appropriate structured literacy program.  Irvine prevailed on Issue 3(c).

    d.  Student did not prove Irvine denied Student a FAPE from the start of the 2020-2021 school year, through January 4, 2020, by offering a modified curriculum.  Irvine prevailed on Issue 3(d).

    e.  Student did not prove Irvine denied Student a FAPE from the start of the 2020-2021 school year, through January 4, 2020, by failing to offer appropriate placement.  Irvine prevailed on Issue 3(e).

   f.  Student did not prove Irvine denied Student a FAPE from the start of
       the 2020-2021 school year, through January 4, 2020, by predetermining
       Student's placement.  Irvine prevailed on Issue 3(f).

   g.  Student did not prove Irvine denied Student a FAPE from the start of
       the 2020-2021 school year, through January 4, 2020, by failing to offer
       appropriate extended school year placement.  This issue was outside of
       the statute of limitations.  Neither party prevailed on Issue 3(g).

   h.  Student did not prove Irvine denied Student a FAPE from the start of
       the 2020-2021 school year, through January 4, 2020, by failing to
       timely complete a triennial IEP.  Irvine prevailed on Issue 3(h).

4. Student did not prove Irvine's November 12, 2020 psychoeducational
   evaluation was inappropriately conducted.  Irvine prevailed on Issue 4.

5. Irvine proved its November 12, 2020 multidisciplinary assessment of Student
   was legally compliant, such that Student is not entitled to an independent
   educational evaluation at public expense.  Irvine prevailed on Issue 5.

## REMEDIES

Student prevailed on Issue 2(i) and is entitled to a remedy for the denial of FAPE.

Under federal and state law, courts have broad equitable powers to remedy the
failure of a school district to provide FAPE to a disabled child.  (20 U.S.C.
§ 1415(i)(1)(C)(iii); Ed. Code, § 56505, subd. (g); see *School Comm. of the Town of
Burlington, Mass. v. Dept. of Educ.* (1985) 471 U.S. 359.)  This broad equitable authority
extends to an Administrative Law Judge who hears and decides a special education
administrative due process case.  (*Forest Grove School Dist. v. T.A.* (2009) 557 U.S. 230,
244, fn. 11 [129 S.Ct. 2484, 174 L.Ed.2d 168].)

In remedying a FAPE denial, the student is entitled to relief that is appropriate in light of the purposes of the IDEA.  (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3).)  Appropriate relief means relief designed to ensure that the student is appropriately educated within the meaning of the IDEA.  (*Student W. v. Puyallup School Dist.* (9th Cir. 1994) 31 F.3d 1489, 1497.)  The award must be fact-specific and be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.  (*Reid ex rel. Reid v. District of Columbia* (D.C. Cir. 2005) 401 F.3d 516, 524.)

Parents may be entitled to reimbursement for the costs of placement or services they have procured for their child when the school district has failed to provide a FAPE, and the private placement or services were appropriate under the IDEA and replaced services that the school district failed to provide.  (20 U.S.C. § 1412(a)(10)(C);  *Burlington*, *supra*, 471 U.S. at p. 370; *Puyallup*, *supra*, 31 F.3d at p. 1496.)

This Decision finds that Irvine denied Student a FAPE by failing to file a request for due process to defend its offer of FAPE in the June 3, 2019 IEP.  Pursuant to California law and the Ninth Circuit decision in *I.R.*, Irvine had a duty to file a request for due process hearing beginning on August 28, 2019.  As a result of Irvine's failure, Student remained at Prentice, in a program Irvine believed was inappropriate and did not offer Student a FAPE in the least restrictive environment, for the 2019-2020 school year, and part of the 2020-2021 school year.  Because Parents funded Student's private placement during this time period, Irvine failed to provide special education and related services to Student at public expense.  Student suffered a loss of educational opportunity and a deprivation of educational benefit by not being in an appropriate placement.  Accordingly, Parents are entitled to reimbursement for the cost of tuition, speech and language services, and transportation related to Student's placement at

Prentice, for the 2019-2020 school year, the Summer 2020 extended school year, and the 2020-2021 school year, through December 2020.

For the 2019-2020 school year at Prentice, Parents paid $27,500 in tuition, a $500 registration fee, and a $50 enrollment fee.  Of that amount, Mother paid $14,300.02 and Father paid $13,749.98.  For summer school 2020 at Prentice, Father paid $1,900 in tuition and a $275 registration fee.  For the 2020-2021 school year at Prentice, through December 2020, Parents paid $18,050 in tuition, a $500 registration fee, and a $50 enrollment fee.  Of that amount, Mother paid $10,050 and Father paid $8,500.  Parents are entitled to reimbursement for these amounts.

In the June 3, 2019, March 13, and May 8, 2020 IEPs, Irvine offered Student speech and language services.  At Prentice, speech and language pathologist Julianna Clark provided weekly speech and language services to Student during the 2019-2020, and 2020-2021 school years.  From September 2019, through December 2020, Mother paid $2,368 for these services, and is entitled to reimbursement for this amount.

Parents provided Student with round-trip transportation between Prentice and Student's home, and Parents are entitled to reimbursement of mileage costs.  Parents are, upon providing Irvine with documentation, entitled to the cost of mileage for one round trip per day of attendance at Prentice for the 2019-2020 school year, summer school 2020, and the 2020-2021 school year, through December 2020.  Mileage must be calculated at 6.8 miles for Father and 12 miles for Mother, multiplied by the then-current Internal Revenue Service mileage rate for the year the trip actually occurred.

ORDER

1.  Within 60 calendar days of the date of Order, Irvine must reimburse Parents as follows:

57

a. $14,300.02 to Mother for the cost of tuition and education-related costs at Prentice during the 2019-2020 school year;

b. $13,749.98 to Father for the cost of tuition and education-related costs at Prentice during the 2019-2020 school year;

c. $2,175 to Father for the cost of tuition and education-related costs at Prentice during summer school 2020;

d. $10,050 to Mother for the cost of tuition and education-related costs at Prentice during the 2020-2021 school year;

e. $8,500 to Father for the cost of tuition and education-related costs at Prentice during the 2020-2021 school year;

f.  $2,368 to Mother for the cost of speech and language services at Prentice from September 2019, through December 2020; and

g. The cost of mileage for one round trip per day of attendance at Prentice for the 2019-2020 school year, summer school 2020, and the 2020-2021 school year, through December 2020, calculated at 6.8 miles for Father and 12 miles for Mother.  Mileage reimbursement must be calculated at the Internal Revenue Service mileage rate at the time of each trip.  Reimbursement will be for trips that actually occurred, and Irvine may require proof of attendance.

2.  All other relief requested by Student is denied.

3.  Irvine is not required to fund an independent educational evaluation for Student at public expense as a result of Parents' disagreement with its November 2020 multidisciplinary assessment.

RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of receipt.


*Tara Doss*

Tara Doss

Administrative Law Judge

Office of Administrative Hearings